May it please the Court, Ronald K., appearing on behalf of the Appellant, Mr. Pedro Alberto Parra. Also at Council table is Ms. Loralee Gates, who is representing Mr. Enrique Zermurcillo. Your Honor, Ms. Gates has granted me the permission to argue the entire 20 minutes, and we would ask to reserve three minutes for rebuttal. Your Honor, the chronology of this case demonstrates pervasive misconduct by the government. The government had been served with exhibits under 17th of 2003, reflecting the coordination of a sub-informant in the case of the United States v. Alvarez, the United States v. Corquera, and also in the United States v. PARRA. The evidence which was provided to the government demonstrated that a sub-informant was reaching out and soliciting methamphetamine transactions in all three cases at the exact same time in Santa Ana, California. The two case agents, Special Agent DeFelice and Special Agent Black, were both working on all three cases. They all were aware from the November 17th filing of the motion for reconsideration, but earlier than that, a year earlier on November 30th of 2002, that the sub-informant was working with the informant in order to solicit methamphetamine transactions from individuals who we provided evidence all three had no background in the had a supervisor that was working on the Alvarez case, which was before the Honorable Florence Marie Cooper. The supervisor was the same supervisor who was working on the PARRA case. The supervisor was coordinating the efforts by the lower-level line assistant on how to address this issue of the sub-informant. One of the things the district court said was that unless there's some sort of a finding of entrapment in those other cases, it really doesn't tell us much about this case and what happened in this case. You just said that in the other cases there was no prior drug activity by the targets. Is that a record? Do we know that? Well, we had sworn declarations from Mr. Rodriguez in the Alvarez case, Mr. PARRA in the Instant case, and the individual who solicited in the Corquerra case was a juvenile. In the Alvarez case, we had no finding of entrapment because the district court granted dismissal. In the Corquerra case, the trial, there was an acquittal for the only defendant that went to trial based on a no-knowledge defense. The juvenile was the individual in the Corquerra case who was sought after by the sub-informant, and that juvenile never was prosecuted in Federal court. Your Honor. Counsel, let me ask you a question, and it's sort of a side issue and it's probably obvious because nobody has said anything about it. I've heard and seen a number of times in the papers and the record that the stuff in front of Judge Cooper was sealed. If it's sealed, would it have been appropriate for the government to disclose that information in another case involving different parties? I believe, would the government or could you? I guess somebody from the defense on that did make some disclosures to the defense attorneys in this case. Were any disclosures of the sealed material appropriate if it was actually sealed? And what does sealed mean in this case? Well, from the defense, the defense never disclosed any of the sealed documents. Whether the, clearly the government had access to the sealed documents because they were served on them. The government, because of the highly relevant nature of these documents, never disclosed any of the sealed documents to the defense. If they were. Well, what would it have disclosed? The fact that there's some kind of sealed documents and I can't tell you what they are or who they involve, but there's some sealed documents in another case, the judge or defendant you might be interested in. Now, you didn't disclose that, even though you were in contact with the other defense attorneys. So it seems like maybe you thought you shouldn't be disclosing the information. I don't know what you thought, and I won't put words in your mouth or your head. But if the government started circulating this to the office for use in other cases, would that violate the sealing order? Oh, I don't believe it would violate the sealing for the government to circulate in its own office. The government is an entity. I said four other cases. Four other cases. And then disclose it in other cases. I mean, call it an entity if you want. Call your law office an entity. But could they have gone in other cases and disclosed all this information? And if so, would they be violating Judge Cooper's sealing order? Well, at the time of the request for the continuance, the identities of the subinformant and the informant have been disclosed. The basis for the sealing was no longer pressing. But moreover, Was the order lifted then? Excuse me. It was never lifted. But the government could have moved for it to be lifted. And the government reveals confidential material all the time with a protective order. Let me see if I can cut to what's troubling me about this case. You're not making a Brady claim. You are so the non-disclosure and a lot of the information that you didn't originally get, you did get before the trial, mainly the phone calls, the phone call information. So the only issues at this juncture are whether a continuance would have made any difference and whether there was false testimony. And I guess that's what I'd like you to focus on. Most of this background doesn't seem to me to have much to do with the issues directly before us, because as I understand it, you're not complaining ultimately about the failure to provide any additional information about the other cases. And let me just finish and then you can answer. And it doesn't appear to me that you're complaining about you never asked for and you're not complaining about the failure to provide the kind of very specific information that eventually led to the dismissal in the Alvarez case. It's a much nearer narrow and discreet issues, and I'm having trouble seeing the and the background given what was ultimately produced and discussed at length at trial. Well, Your Honor, in all due respect, there was a Brady claim that was raised. There isn't one now. There is one that's presented in our opening brief. I'm sorry. And with regard to the other cases, the majority of information from the other cases was not shared with the defense. Specifically, the declarations, all the information from the Corcoran, the Alvarez case, and the confidential informants' phone records. What the defense had access to was the sub-informants' phone records. If the government had disclosed to you, we've got this sub-agent working in this case. The sub-agent made numerous contacts. Here are the phone records of the sub-agent and the agent, and the, I don't mean the sub-agent, sub-informant and the informant. Would that have been sufficient, or are you complaining that they didn't disclose what was going on in all these other cases, too? Well, I also think that what was going on in the other cases, based on 404B and modus operandi, was critical. But the government did not disclose the phone records of the informant. But a critical issue that Judge, Your Honor, Judge Burson focused on, is the continuance. The misrepresentation of the government in the battle over the continuance was specifically that the sub-informant's sole role in this case was to introduce the defendant to the informant. The government stated that in its request for continuance, it stated that in trial, it stated that in the motion for a new trial. The only time it's ever made any reference that that was an inaccurate statement is before Your Honors in this court, that that was a misrepresentation, an inaccurate misrepresentation. And Judge Tavrisian in the district court specifically said, I will not grant this a continuance because I find the only role of the sub-informant was to introduce the informant to the defendant. What would the continuance have done for you? What information did you then have that you needed time to digest? Well. And how long would it take to do it? I was not counsel of record at the time. The defense counsel did not have an opportunity to show the sequence of phone calls between the sub-informant, the informant, and the defendant. Well, he hasn't, but he did have them during the trial and use them extensively during the trial. Only the sub-informant's records. Well, that's a dispute. It's very mysterious. It is mysterious. There's a statement in the record. Let's see if I can find it. I've already marked it. Well, maybe I can't. But there's this very strange interchange, and maybe you can tell me where it is, where the government comes in and says that I'm going to tell you on, I think, January 16th, and tells the judge about these additional records and seems to say he's handed them, that the defense now has them. Right. And then the judge finds that you did have them. Well, the fact of the matter is, Your Honor, not I, but the defense counsel has signed a sworn declaration. He has presented it to the court. He was there for cross-examination. He stated he did not have these records. And then, Your Honor, if you look at the comparison between the sub-informant's records and the informant's records, that's critical to show why he didn't have it. The sub-informant's records, there was some cross-examination reflecting the volume of calls. But with regard to the informant, it was completely empty. Wasn't the informant asked something like, or wasn't somebody asked it during the trial, to whom did the confidential, to whom did your bills, your telephone bills go, that kind of thing? Which is a kind of a curious question just out of the blue. But I guess we know the answer to that is they went to his father. And it's an interesting shot in the dark. That's all it was, was a shot in the dark. With no inkling that some answer like that was coming. Well, Your Honor, I can tell you that I did not provide it to co-counsel. It's beyond the record. But I have inquired, and I believe I know how the co-counsel for Enrique Zimmercio found out that information. But Mr. Parra's counsel never found out that information. Mr. Parra's counsel, the appellant before this court, was completely in the dark about anything regarding these records. And he provided a sworn declaration. And there was no cross-examination reflecting this. Your Honor, we had, the gravity. And that was at the time of the motion for a new trial? He provided a declaration at the time of the motion for a new trial. Then there was a finding, but that was drafted by the government, which is a very strange thing to do about allegations of prosecutorial misconduct. Is that right? Excuse me? But there were findings by the district judge. Yes. The contrary. I.e., that the records were available. There was findings by the district judge that were drafted by the government, which I objected to, which the district judge never had access to my objections because I was never served as counsel of record with the proposed findings. But the fact of the matter is, in the big picture? Well, the district judge adopted them, though. So we have to say that the district judge's work, correct? Well, Your Honor, here's an issue I'd ask. I mean, I don't care who drafted them. Well, I ask the Court to consider this. I think it's an odd situation, though, when the accusation is the prosecutorial misconduct. Interesting. An interesting issue is that now before the court of appeals, the government says it made an inaccurate statement that the sole role of the subinformant was to introduce the informant to the defendant. That's happening now before the court of appeals. But prior, when the district court embraced the government's position, the district court did so based on the government's representation, that the role of the subinformant was sole. At the continuance. That was at a completely different time. Well, it was throughout the trial and throughout the mistrial – throughout the motion for the mistrial. The government maintained continuously that the sole role of the subinformant was to introduce the informant to the defendant. The real ultimate problem here is that although you – there is no proof that that in a way isn't so. We know they talked a lot after that. But what else do we know? We know from three cases and from the sequence, interrelation between the subinformant and the informant's records, that such an – such an allegation is preposterous. He introduced three people. He was obviously operating as an informant. He was obviously trying to promote drug use. He was getting paid to do it. But all that came out at trial. So – but what didn't come out at trial, and you had – the records did exist, is what went on in those telephone calls. Because they weren't recorded, and he testified about what happened. And whether he had gotten them earlier or later, I don't know how he would have gotten behind it. I'm having a hard time seeing how either the time sequence or having the additional records would have helped you get behind the representation that he did not harass him to the point that it was entrapment, particularly given the other – the fact that you have another element to prove, which is non-disposition. And you did try to prove that, you know, quite effectively. But it didn't work, apparently. Well, Your Honor, just for – as a concrete example, the informant stated initially that he only contacted the sub-informant two or three times. This is under oath. When Mr. Enriquez's counsel cross-examined and said, there are approximately 50 calls or something, he said, oh, okay, well, I did it 50 times. But the majority was social in nature. Well, that came out. I mean, that's the problem. What I'm having a difficulty with is that the fact that he was – had more contact than he originally claimed came out at trial. What would you have gotten from either a continuance or additional information that would have done better than that? Well, what it would have shown is that, okay, it would have taken that explanation and tossed it in the trash. It would have said, well, on this day, Mr. Parra was called by the sub-informant, and then he called you, and then you called him back. And then looking at the sequence of timing, it was transparent that he was involved in the orchestration of these phone calls. Wasn't it, though – I mean, you've got a government concession that he's an agent for purposes of an entrapment defense, and you've got records of 50 calls that he made in that two- or three-week period. And you can – if there was entrapment, it had to be in calls from the sub-informant. When you've got those records, 50 or more calls made in a very short period of time, and you have to argue, well, why would he make all these calls if he wasn't cajoling and forcing and pressuring? But I guess I'm sort of with, what does it add to say, well, and after those calls, he called the top informant? Well, what the sub-informant and the informant maintained throughout the sub-informant's role, as I've stated, was only to introduce. Then the government, in closing argument, says the informant was telling the truth, fully vouching for him. He was fully telling the truth. He did not lie. Everything he said, similar to the Weatherspoon case. And did the informant say anything about not making telephone calls to the sub-informant? No, but the informant did say that his phone calls were almost exclusively based on other arrangements, but only two or three calls had to do with the drug transaction that was to transpire. Which are we talking about now, the informant being? Polito. Polito. Polito. Yes. Well, he was running all these other deals with this guy, so in some ways that cuts against you, because he could have been talking about all the other deals. Well, what the telephone records would have shown is that the sequence of phone calls is the sub-informant's calling Mr. Parra, the sub-informant's calling the informant, or the informant's calling the sub-informant. So it's all related in the context. And you have the records of the first two of those. You have all the calls that Gomez, the sub-informant, made to Polito. Correct. Yes, to Polito. And then all the ones that the sub-informant made to the defendant. Correct. What you don't have is all of the calls that Polito made to the sub-informant. Correct. And Polito testified that, well, we talked to each other about 50 times. And only two or three of those times were relevant to this case. And stating unequivocally, I'm the one. In fact, it was 150, I guess, or something like that. 117. 117. I wonder how much. It was like in a three-week period. But unequivocally, the informant took the witness stand and said, I deal with the drug dealers. He just introduced me, and then we move on. The sub-informant unequivocally, under oath, said, I introduced them. It's there. I mean, that was totally impeached. I mean, you got 50 calls. He called this guy within three weeks 50 times after he said all I did was introduce him. And what about with regard to the Alvarez and Corquera case? They completely would have contradicted these claims by the primary witnesses of the government. And the fact of the matter is that the two agents and government counsel were aware of this. They allowed this to occur. So what is it? Let's talk about the other two cases and what information should have been provided with regard to them. First of all, does your Brady claim go to those other cases as well? Yes. It did and it does now? Yes. And what is it that you contend should have been produced? Well, in the Alvarez case, there were declarations of the co-defendant of Mr. Alvarez, Mr. Rodriguez, reflecting his interaction with the sub-informant. There were DEA-6 government reports reflecting that the government was aware of the sub-informant back in November of 2002. There were transcripts from the Corquera case where Agent Black takes the witness stand in the instant case before the court and basically says, no, if there was any type of entrapment, I would understand. I would know this. Yet in the Corquera case, we see that he specifically was aware of the sub-informant. He specifically did know that the sub-informant had an integral role in that methamphetamine prosecution and arrest. So, okay, if we have one case and we have some phone records, okay, the government can say, well, we don't have any content. How are we going to make any determination what actually was said, whether this was solicitation? Perhaps there they have a stronger case. Tell me why. I mean, this whole situation is very disturbing, what the government was doing. I'm just having a hard time understanding why it, for example, what went on in the Alvarez case and the other case, as you've described it, supports the entrapment. And it supports the fact that there was a sub-informant and that he was involved. But why is that a support entrapment? Well, Your Honor, Mr. Parra was claiming throughout that he was wavering, that the sub-informant would continue to call him, put pressure on him. And we know the sub-informant, and you may have been able to demonstrate more than you did that the sub-informant was involved in other cases, too. But what does that prove? Well, that shows that he's in the business at this very same time of trying to get as many convictions as possible. And that didn't come out at the trial? Not to the extent it would have if he would have presented evidence that he was, had this machine, this operation. Did he have evidence at the trial that he was involved in 10 to 12 of these cases? Yes. But not the fact that at the instant time he was contacting and calling and soliciting people from his past that had no criminal history. Think of the ramifications of this. Mr. Parra, Mr. Rodriguez. Is that the evidence? If you could be more specific about what evidence you thought would be helpful, is that the evidence that would be helpful, i.e., that the other people similarly had no criminal history and that they were also people he knew in the past? And all of them claimed that he was pressuring them. But none of them were held then. I mean, there was no finding. I mean, even the case before Judge Cooper was dismissed without any finding because the government failed to provide a discovery. So there's never been a finding, as I understand it, of harassment, of entrapment. But why should that be held against Mr. Parra? Just because Mr. Parra — Not held against him. It just doesn't help for him. Well, Judge Cooper said that it showed that there was a viable entrapment claim. And there was a viable entrapment claim. And it was tried very well, and it failed. No. There was a — Judge Cooper said a viable entrapment claim in Alvarez. Right. And there was a viable one here, too. And it went to trial, and it was vigorously argued. Your Honor, if the informant and subinformant were seen to be liars, I mean — and there was no doubt in the jury's mind. And if the agents were in collusion with them, and then the government, through counsel, takes — in closing arguments, says they were all telling the truth, what would the jury have then thought? And with regard to misconduct for a motion for a new trial, all you need under United States v. Eggers is one juror. One juror could have changed the ultimate result in this case. Okay. We've let you go over time. We appreciate your argument. It's been useful. We'll give you a minute or two in rebuttal. Thank you very much. Thank you. May it please the Court. Well, the government does contend, Your Honors, that there was no prosecutorial misconduct here, and there was no prejudice to the defendant, and that the defendants received a fair trial. Before I discuss those issues, I do want to assure the members of this Court that in making those arguments, the government understands, and our office understands, and I understand that there were deficiencies in the way several issues in this case and the other cases were handled. For example, there was government misconduct at the outset, which was corrected the next day. There was a — there was an innocent misstatement, Your Honor. And, of course, any time that an AUSA says something in court orally or in writing and it isn't accurate, that is, of course, an unfortunate matter. So that is correct. And we did try to rectify it when it came to light that this statement had been made and that the government was taking a position in this case that was not consistent with the position that we had taken in the other cases. And there were statements made at various points that seems to me, which you haven't really pointed out, that it seems to me should have been corrected. I mean, for example, at one time the subinformant testifies that this is something like was it your hope that you would receive money for this drug transaction? Not really. And there's a lot of that going on in this trial. Well, Your Honor, in that, in regard to various statements by the subinformant, there were various points where he testified as to certain issues, all of which were corrected, I believe, on cross-examination or on further examination. And there were points where he admitted, yes, now you've shown me the evidence. You're right. I testified mistakenly. So I think, again, fortunately, whenever there's some sort of informant testifying, particularly in this case one who's been called by the defense and about whom the government had very little interaction, I don't think it's that surprising, though unfortunate, that certain things that are initially stated are not accurate. But I believe here through the cross-examination of the parties, an accurate account of the subinformant's activities did come to light. He said he worked on many cases. Well, as I understand it, it actually does not accept that explanation. It basically says that the government is supposed to correct it by itself, and even if it's corrected later on, that's not necessarily the same thing. Well, Your Honor, I think here it was corrected in the course of the examination, which I think is what's critical. In the case Your Honor was referring to, there was the idea that to correct it after the jury's heard all the evidence, in fact after the defense has given their closing argument, so they can't emphasize or weave the government's concession or the correct facts into the defense argument to wait until the rebuttal. I don't think that's the idea. I think the idea is that the prosecutor is supposed to stand up at that moment and say, excuse me, but that is not a truthful statement, and that there's a difference between the government saying it's not a truthful statement and the defense cross-examining him and bringing out an alternative statement. The defense actually called him, is that correct? That's correct, Your Honor, yes. Anyway, go ahead. It wasn't the government calling him and asking him questions that he lied on, and the government didn't correct him? The defense called him, asked him questions, and then they cross-examined him also, is that correct? That's correct, Your Honor. The government had stated earlier, in fact, that we would stipulate he was an agent for the government and that we would not be calling him at trial, and that was part of the clarification that was made to the court to overcome the initial. What is your understanding about this January 16th colloquy and the fact that there's a sworn declaration by the defense lawyer saying he never got these records and this kind of strange interchange in which maybe he did get the records and so on? Well, Your Honor, yes. I believe that when one looks at that transcript, it is very clear that what the trial prosecutor did was hand over the telephone records that were being discussed. In fact, the AUSA said, and have now provided those to the defense, and that's at line 5 of page 7 of the transcript, government's excerpt of record 278, and a little bit later he said, but I just wanted to make sure that the court understood exactly what the situation was with respect to those records. That's at lines 15 through 17. Then Mr. Enrique Hermosillo's counsel said, we are not raising an issue on those records. And then when Mr. Parra's counsel next addressed the court, he addressed a search warrant issue and not the issue of these phone records. So all I can say is, is that I don't know who prepared his declaration or the circumstances of it, but certainly it just appears Mr. Olive was mistaken about which phone records were being discussed, which certainly could be an innocent mistake, given that there were a number of phone records that were involved in the case. And the district court, having been at the trial, having seen this exchange, which is reflected in the transcript, explicitly found that no later than Friday morning on January 16th, the defense did have the confidential informant's phone records. And, of course, it appears that Mr. Enrique Hermosillo's counsel had them earlier because he did raise a question with the C.I. about his father. And given the context of that, it's hard to see how that would have arisen if he, if that counsel had not had the phone records. He's also the one who said we're not raising an issue on those records. That's correct, Your Honor. So we don't really know about the other lawyer. It was the other lawyer who signed the declaration. That's correct, Your Honor. Okay. Go ahead. Now, Your Honor, in regard to the continuance issue which was discussed, the court initially denied the defense's request for a continuance, which was the sixth request for a continuance. And I think it was appropriate for the district court to take that fact into account in deciding whether there would be yet another continuance of the trial. But at this particular instance, time, what was the status of the Alvarez and other cases as distinct from the earlier points? I mean, was there a reason at that juncture why they had new information regarding the other trials? Your Honor, the Santa Ana case had been over for quite some time. That had finished in the spring. So there wasn't any new information there. In regard to the case before Judge Cooper, the Alvarez case, there wasn't any new facts or evidence in the case. But in December we had a hearing where Judge Cooper indicated that she was going to order some discovery that the government had previously said would lead to the dismissal of the case. And because realizing, in effect, her discovery order was tantamount to being a dismissal order, we asked for more time to have a hearing on the issue and to discuss the issue. And realizing the gravity of her decision, Judge Cooper agreed to do that. And then it was later in December she made the order and we came back. And then we came back and said, well, we want to have an evidentiary hearing. And then ultimately the ‑‑ she did rule that the case would be dismissed when we stated we would not be putting up the discovery. But that same information was never specifically requested in this case? No, Your Honor. That was the understanding of what was going on when there was a request for the continuance as set forth in the defense papers for the continuance. And that were papers that were filed on January 11, 2004. Mr. Alv asked for ten categories of documents. And I think the only one he ultimately did not get was Category 7, which was a list of all cases by the sub‑informant. But we understood that as, again, a list of all cases that he'd ever worked on. If there had been a specific request for the cases that were already indicted and as to which there was already disclosure of his involvement or the CI's involvement, certainly I would have authorized that because it was already out there. And so there would have been ‑‑ and if the reason was it was under seal, somebody had approached the trial lawyer or me in the Alvarez case to have it unsealed through a protective order for purposes of the Parra case, we would have done that. But in response to Judge Fernandez's earlier questions, Your Honor, I do want to say if the government, which essentially at this point to a certain extent means me, if I had understood that the defendants in the Parra case did not have access to all the information in the other cases or in under seal filings, and if I thought that was, you know, relevant in a Giglio or Brady way to that particular case, then whether or not it was under seal, I would have gone to the judge in the under seal case and asked for it not to be unsealed. But isn't that the specific reason they asked for the continuance was because of the Alvarez and I forget the name of the other case and the need to gather information about those cases? Well, yes, Your Honor, but as ‑‑ The other reason was the felon records. That there was not a specific request for, well, there was a request for certain phone records, namely the defendant's phone records, and those were turned over in the Parra case. And, of course, if there had been a specific request for the CI's phone records, we certainly would have turned over those, again, to analyze or look at the phone records of the informant and the defendant in an entrapment case as basic discovery, and nobody would have contested the defendant's right to have that information. Yes, but now what you're saying is that they had to ask for it. My understanding of Brady is they don't have to ask for it. So if it would have supported at least their notion that there was ‑‑ I mean, it has some probative value as to whether or not there was a concerted effort to continually encourage this person to go through with the deal. It certainly has some connection to that question. So why didn't you just have an obligation to provide the CI phone records? Your Honor, as to that, I believe that, again, certainly my understanding, which, again, was a couple levels removed, but was that they had that information. And, again, to the extent that it was not ‑‑ that the CI's records were not turned over, that was inadvertence on the part of the government. So, but again ‑‑ Your ultimate position on that, as I understand it, is that you should have turned it over. It was Brady evidence, but they got it in time during the trial. Is that basically what your position is? Yes, Your Honor, with the point that it became Brady evidence when an entrapment defense was asserted, and, therefore, it became material to the issues in the case. Although it hasn't been argued here, I would like you briefly to discuss the ineffective assistance of counsel case issue in the other case. I found, candidly, your question of that brief, of that issue, completely unconvincing with regard to why it wasn't prejudicial or why there wouldn't have been a severance granted had it been raised in time. So my understanding that we are quite reluctant to decide ineffective assistance cases on appeal, why isn't this a case in which there's just no plausible explanation for why a lawyer who, A, raises a completely ‑‑ first raises a completely untenable defense, should not have at that moment forgotten about that and long before that asked for a severance in this case? Well, Your Honor, first, again, it's, I think, to go back and to say that a, you know, experienced defense attorney who, obviously, on many issues performed quite vigorously and well during the trial, was so deficient that his actions were ineffective, really requires an evidentiary hearing through a 2255 where the parties in the court can hear his side of the story. I've had very little experience as a defense attorney myself, and I would not want to second guess as to what the tactical decisions were that ‑‑ Well, you didn't extend an argument in your brief about why there wasn't a conflict here, and I don't think there could have been a clearer case of a conflict here. I mean, in the sense that here you had the defense defendant getting up and admitting to exactly what it was that his codependent was contesting, i.e., that they were there and that there was a drug deal. And so under those circumstances, it's very hard for me to see why there wasn't quite obviously prejudice and why ‑‑ I mean, I understand the difficulty with regard to the 2255, and perhaps it would be more useful to hear from the lawyer, but I really would have a hard time understanding what he could say. Well, Your Honor, I think one has to look in this, you know, whether the defense and the trial strategy that was adopted was the ‑‑ it wasn't whether it worked or didn't work, but whether it was, you know, the best or someone in faith could think it was the best from a group of bad possibilities. And frankly, Mr. Enrique Temercio did not have many cards in his hand. Well, that's true. That's true, which is exactly why he might have pled guilty if his lawyer had not put a certain number of eggs into a very bad basket. Well, Your Honor, I find usually when difficult cases go to trial, it is more the defendants who are insisting on, you know, boarding the Titanic than having the lawyer do so. So I can't really criticize why the decision was made to go to trial. And, of course, in direct cases, sometimes with the mandatory minimums, you have a choice of going to trial and getting 20 years or you have a choice of pleading guilty and getting 20 years. And at that, you know, case, it's always fun to be in federal court, so why not go to trial? Of course, he could have hoped that by the time they showed what scumbags the informants were, that would help him, even though technically, legally, it didn't. If he had a separate trial, he couldn't hardly make those arguments because the scumbag informants would almost be irrelevant. So he did get maybe some benefit from that. I think that's...  I think that's right, Your Honor. In a larger case, there might be some confusion. Things can happen. And ultimately, I think that Mr. Parra's testimony was not utterly damning as to Mr. Enrique Hermosillo. I think he did what he could not to... It wasn't a case where he was saying he was, you know, blaming it everything on Mr. Enrique Hermosillo or anything. The whole thrust of his testimony was to try to leave him out of it as much as possible. So ultimately, I don't think that there was prejudice there. And there was certainly reasons why being in a trial with the other defendant, one could hope, given the difficult situation he found himself in, that, you know, lightning would strike or that something would turn up. Okay. I guess when you talk about... I understand your statement that the prosecutor made misstatements, at least in some cases when he wouldn't have been aware of the facts. But if we look beyond that to the agents and the way they're running these cases, yet it's disturbing when you have people with no prior records and you've got a sub-informant who makes 50 or 60 contacts with them, all unrecorded. And then when the fruit's finally ready to drop, the informant comes in with a wire and you get the transaction taped and stuff. It seems to me the potential for abuse here is immense. Yes, Your Honor. You know, we, as I'm sure the Court can imagine, we had an extensive discussion of that point with Judge Cooper, who was very concerned about that. And certainly for all the reasons that Judge Trott has stated in his monograph on confidential informants, anytime confidential informants are engaged in activity where they are not being closely monitored by the special agents, and in turn whenever there are facts, pertinent facts about the case, that the prosecutors do not know about, that the agents do know about, and there's not very close communication, then certainly the possibilities of problems and difficulties exist. As I recall also, the prosecutor argued to the jury specifically that the agents were monitoring these people closely, and that isn't so. Well, Your Honor, what the government's argument at trial was, by having the tapes of the actual negotiations, that gave kind of a check on any unmonitored activity that would have happened, and therefore by reviewing those, there was some objective evidence as to what the course of the negotiations had been, and defendants' willingness to do the deal. And in fact, without excusing, again, the important need to have constant monitoring on all aspects of the investigation, I do think, in fact, that there were aspects of this investigation that were well done. And in that regard, I think the agents, although I reluctantly had to criticize some of their decisions, I do think in the setting up of the deals and having the tape recordings, and in that aspect of these cases, I think they were well done, and I think that does give us a comfort level that entrapment was not occurring. And also in that regard, very quickly, Your Honor, on the predisposition issues, the juvenile testified in the Santa Ana case, and he, in fact, did not give an account of particularly being entrapped. Essentially, he said Mr. Gomez approached him, and he said, yeah, I'll see what I can do, and he went out and arranged a very large methamphetamine deal, and one of the defendants in the Alvarez case, in fact, had a conviction. And then, of course, in this case, there was the prior narcotics activity of Mr. Parra, which even under his view, even what he said at trial, was that he knew that there was cocaine around, and he was just helping his brother with the storage of the cocaine, which is, you know, while not as serious a crime as dealing in large amounts of methamphetamine, certainly is something that the jurors could well think did not reflect well on his predisposition. So, again, I think that even if when one looks through all the information in all of the combined cases, there was not the sort of specific and detailed evidence of entrapment that would have made a difference in this particular trial. Thank you very much. We'll give you a minute or two. Thank you. Your Honor, Your Honors, the continuance should have been granted. The government knew that, in fact, the subinformant had been orchestrating these cases. This supervisor, this line deputy, had changed their position. January 7th, they said that the informant was not an agent. You're not entitled to a discovery. January 8th, they said the subinformant is an agent, exactly the same situation that they presented in Alvarez, and you're not entitled to discovery. There was coordination. When you take that... That's correct. And that was even the second time, I think, he said that. That's correct. And that was wrong. That was a misrepresentation to the court. The district court then heard this information, said, I find that the only role of the subinformant was to introduce the defendant to the informant, and, therefore, a continuance is not necessary. It's not as probing. You have enough information. This is a government we have to impute knowledge upon the line deputy when the agents clearly knew, when the supervisor clearly knew, and the district court was deceived. Moreover, the issue with regard to the telephone records that were produced of the informant on January 16th, we have produced the highest level of evidence possible, a sworn declaration of an attorney of law  They have produced nothing. They have produced no... Well, they produced a transcript which appears to say something to that effect. Right. And your argument, I gather, your stronger argument is that there should have been a hearing where the attorney could have come in and said what he said and it could have been cross-examined and Judge DeVeres could have made a decision not based on something. But, moreover, Your Honor, the records apparently, if they were produced, which are from the representation of the attorney, they were produced after the informant had already testified on the fourth day of trial. Voluminous telephone records where they're supposed to go and construct a detailed cross-examination. The credibility of the informant and the sub-informant were critical in this case. They were bolstered by the agent. They were vouched for by the AUSA in the closing argument. Once the credibility of the informant and the sub-informant were... See, my problem is, and perhaps, you know, you look at the Bluford case, for example, where the problem there was that they knew what was in the telephone calls and they were asking people to draw a contrary inference. In this instance, nobody knows what was in the telephone calls. No matter how many of them you've got, you still don't know what was said in them. Well, Your Honor... Which is a problem in itself but doesn't seem to be one that has a legal theory behind it. But they should not have made a representation unequivocally to the court, to the jury, that all the sub-informant did was introduce these people. And once the jury believed the sub-informant of that, then they discarded Mr. Paras. Did he make that representation to the jury? He certainly did to the court originally, but what about to the jury? Well, he stated that... Clearly, the informant and the sub-informant stated that. And the line deputy said, everything he is telling you is truthful. The informant absolutely is telling the truth. Ladies and gentlemen, that's what he did. He vouched for their testimony. Thank you very much. Thank you, Your Honor. It's an interesting case and the argument has been helpful. Thank you very much. The cases of United States v. Parra and United States v. Herbosillo are submitted and...
judges: Canby, Fernandez, Berzon